# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

IN THE MATTER OF THE SEARCH OF
THE FOLLOWING LOCATION:

Buccal (Cheek) Cells From the Person of
Andrew Soboleski

**No.** 19-mj-277-01-AJ

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Kyle A. Kassa, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a 2004 graduate of the Maine Criminal Justice Academy's 7th Basic Law Enforcement Program and am employed as a Deputy Sheriff with the York County Sheriff's Office (Maine), and have been since November of 2005. Prior to that I was employed as a Patrolman with the Buxton Police Department. I am currently a Task Force Officer (TFO) assigned full time to the Federal Bureau of Investigation's Safe Streets Gang Task Force.

2.      In the course of my law enforcement training and experience, I have had an opportunity to search for, seize, and personally observe what I have recognized to be and what was later confirmed by drug analysis to be schedule drugs, including but not limited to heroin, fentanyl, methamphetamine, cocaine, marijuana (both dried and growing), crack cocaine, and various narcotics lawfully available only by prescription.  I have conducted or participated in, among other things, surveillance, undercover transactions, debriefings of informants and confidential sources, and reviews of taped conversations relating to narcotics trafficking. I have assisted in many other investigations, both state and federal, to include investigations of crimes of violence. I have drafted

numerous search and arrest warrants and have assisted in the execution of numerous search and arrest warrants.

3.     I make this Affidavit in support of an application for a search warrant for the Person to be Searched described in Paragraph 5. I submit that probable cause exists to believe that violations of 18 U.S.C. § 1951 (Hobbs Act robbery) and 18 U.S.C. § 924(c) (possession of a firearm during and in relation to a crime of violence) have been committed and that evidence of these offenses described in more detail below, is present in the Person to be Searched described in Attachment A.

4.     This evidence is seizable pursuant to Federal Rule of Criminal Procedure 41 as evidence of the commission of the criminal offense. I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation, from discussions with other agents of FBI and other law enforcement agencies, and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another FBI agent, law enforcement officer, or witness with knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated.

**PERSON TO BE SEARCHED & ITEMS TO BE SEIZED**

5.     I respectfully submit this Affidavit in support of a search warrant to obtain samples of buccal cells from inside the mouth of Andrew Soboleski. The purpose of obtaining the buccal cells is so that deoxyribonucleic acid (DNA) profiles may be compared to DNA profiles identified on evidence items identified in Paragraph 14 of this affidavit, collected from

the premises of                          in York, Maine on August 3, 2019.

6.      I have learned from training and experience that obtaining a sample of one's buccal cells and testing them is an effective method for determining that person's DNA profile. I have obtained DNA test kits, each containing a sponge foam collection device for the purpose of collecting these samples. The collection device is placed in the subject's mouth along the subject's gum-line, at the fold line of the cheek, and under the tongue. The sample collection process takes approximately fifteen seconds after rubbing the foam tip on the inside of the cheek. The collection sample is then pressed on a collection card and sealed in a multi-barrier collection pouch.  The collection process will be carried out by a law enforcement officer, and the process is sterile and safe for both the donor and the collector.

7.      After obtaining buccal cells from Andrew Soboleski, I intend to request that the FBI Crime Lab in Quantico, Virginia perform an analysis to determine if DNA collected from the premises of                          in York, Maine belongs to Andrew Soboleski.

**SHOWING OF PROBABLE CAUSE**

8.      I adopt and incorporate my affidavit filed in the United States District Court for the District of Maine (attached as Exhibit 1) dated October 21, 2019, in the matter of the search of records related to the T-Mobile cellular telephone number (603) 820-4193 ("Soboleski Phone 1").

9.      I adopt and incorporate my affidavit filed in the United States District Court for the District of Maine (attached as Exhibit 2) dated November 27, 2019, in the matter of the search of records related to the T-Mobile cellular telephone number (603) 820-5340 ("Soboleski Phone 2").

10.     On November 12, 2019, the Federal Bureau of Investigation issued a subpoena to T-Mobile, the cellular phone carrier for the "Soboleski Phone 2" for subscriber and toll records

between the dates of July 14, 2019 and August 18, 2019. In response to the subpoena, T-Mobile identified the subscriber name as Andrew Soboleski.

11.     An analysis of the "Soboleski Phone 2" toll records from the night of August 2, 2019 and the morning of August 3, 2019 indicated that he interacted with telephones known to be associated with Luis Carpio and Jason Candelario.

12.     An analysis of the call activity of "Soboleski Phone 2" revealed the following specific activity:

a)     Soboleski interacted with Luis Carpio on the night of August 2, 2019 from 8:43 P.M. through 9:12 P.M.

b)     Soboleski interacted with Jason Candelario on the night of August 2, 2019, primarily by text messages from 8:52 P.M. through 9:37 P.M.

c)     On the morning of August 3, 2019, beginning minutes after suspects fled

Soboleski begins communicating primarily by phone calls to and from Jason Candelario. The phone exchanges between Soboleski and Candelario occur twelve (12) times between 12:42 A.M. and 3:12 A.M.

13.     On November 20, 2019, I interviewed Andrew Soboleski at his residence in Manchester, New Hampshire.

14.     In sum and in substance, Soboleski acknowledged being associated with both Luis Carpio and Jason Candelario. Soboleski denied his involvement in any capacity with a robbery or shooting in York, Maine on August 3, 2019. Soboleski stated that he had not been to Maine in years. Soboleski provided me with a cellular phone number ending in 4193 ("Soboleski Phone 1"), stating that it was his current phone number and had been "forever". Soboleski denied having any other phone number associated to him.

15.     On November 22, 2019, I reviewed a report completed by the FBI Laboratory. The FBI laboratory identified multiple evidence exhibits seized from                     that contained a DNA profile of a male individual that were suitable for comparison purposes.

16.     I queried the FBI's Federal DNA Database Unit (FDDU), to determine if a DNA profile of Andrew Soboleski existed in the database in order to compare with any profiles determined to be present on evidence collected from                     I learned that Soboleski's DNA profile had not been previously entered into the database.

17.     On November 27, 2019 I obtained a search warrant in the United States District Court for the District of Maine for information associated with the T-Mobile account of the "Soboleski Phone 2" (2:19-mj-341-JHR).

18.     On December 12, 2019, in response to the executed search warrant, T-Mobile provided me with historical cell site location details of the "Soboleski Phone 2'. The data revealed that the "Soboleski Phone 2" phone traveled from Manchester, New Hampshire on August 2, 2019 to the York, Maine area on the morning of August 3, 2019. The "Soboleski Phone 2" was utilizing a cell phone tower in York, Maine as well as other cell phone towers in the immediate vicinity of York, Maine during the timeframe of the robbery.


/s/ Kyle Kassa
_____
Kyle Kassa
Task Force Officer, FBI

Sworn to before me this 27th day of December, 2019.


/s/ Andrea K. Johnstone
_____
Andrea K. Johnstone
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF RECORDS RELATED TO T-MOBILE CELLULAR TELEPHONE NUMBER (603) 820-4193 | No. 2:19-mj-318-JHR |

<u>AFFIDAVIT IN SUPPORT OF APPLICATION</u>

I, Kyle A. Kassa, being first duly sworn, hereby depose and state as follows:

<u>INTRODUCTION AND AGENT BACKGROUND</u>

1.      I am a 2004 graduate of the Maine Criminal Justice Academy's 7th Basic Law Enforcement Program and am employed as a Deputy Sheriff with the York County Sheriff's Office (Maine), and have been since November of 2005. Prior to that I was employed as a Patrolman with the Buxton Police Department.  I am currently a Task Force Officer (TFO) assigned full time to the Federal Bureau of Investigation's Safe Streets Gang Task Force.

2.      In the course of my law enforcement training and experience, I have had an opportunity to search for, seize, and personally observe what I have recognized to be and what was later confirmed by drug analysis to be schedule drugs, including but not limited to heroin, fentanyl, methamphetamine, cocaine, marijuana (both dried and growing), crack cocaine, and various narcotics lawfully available only by prescription.  I have conducted or participated in, among other things, surveillance, undercover transactions, debriefings of informants and confidential sources, and reviews of taped conversations relating to narcotics trafficking.  I have assisted in many other investigations, both state and federal, to include investigations of crimes of violence. I have drafted numerous search and arrest warrants and have assisted in the execution of numerous search and arrest warrants.

1

EXHIBIT 1

3.      I have personally participated in the investigation set forth below.  I am familiar with the facts and circumstances of the investigation through my personal participation, from discussions with other agents of FBI and other law enforcement agencies, and from my review of records and reports relating to the investigation.  Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another FBI agent, law enforcement officer, or witness with knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed.  Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated.

4.      I submit this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41, for the following:

a.   A search warrant directing T-Mobile to provide historical cell site and sector/face information[1] for telephone number (603) 820-4193, a cellular telephone with service provided by T-Mobile, 4 Sylvan Way Parsippany, NJ 07054.  I believe this telephone is used by Andrew Soboleski.  I also request that the search warrant direct T-Mobile to provide a listing of all control channels and their corresponding cell sites and an engineering map showing all cell site tower locations, sectors, and orientations.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1951 (Hobbs Act robbery) and 18 U.S.C. § 924(c) (possession of a

---

[1] A cell site is located in a geographic area within which wireless service is supported through radio signaling to and from antenna tower(s) operated by a service provider.  Cell sites are located throughout the United States.  Cellular telephones that are powered on will automatically register or re-register with a cellular tower as the phone travels within the provider's service area.  The registration process is the technical means by which the network identifies the subscriber, validates the account and determines where to route call traffic.  This exchange occurs on a dedicated control channel that is clearly separate from that used for call content (i.e., audio) – which occurs on a separate dedicated channel.  As used herein, "cell site information" refers categorically to any and all data associated with registration of the target telephones with cell sites/network, as well as other data used by the network to establish a connection with the telephone handset and to maintain connectivity to the network.  This includes the physical location and/or address of the cellular tower, cell site sector, control channel number, neighbor cell lists, and any identification numbers, processing data, and parameters not pertaining to the contents of a call.

firearm during and in relation to a crime of violence) have been committed by unknown individuals.

Showing of Probable Cause

6.      In the early morning hours of August 3, 2019, York Police department received an emergency 911 call reporting a shooting at                          York, Maine.

7.      When officers arrived, they encountered a male (later determined to be the homeowner) and two females in the garage area of the residence. The homeowner had been shot in the abdomen.

8.      Law enforcement personnel were able to interview one of the females who stated that she had travelled to the residence with the homeowner and the homeowner's girlfriend. She indicated they had been out that evening and then returned to the residence in the same vehicle. She indicated that that they backed into the garage and the garage door started to close but then the door was re-opened. Two masked men entered the garage. One of the men became engaged in a physical altercation with the homeowner outside the vehicle. She went to assist the homeowner and as she was engaged in the altercation between the two men she heard a gunshot and saw that the homeowner had been shot in the abdominal area. The masked men then fled.

9.      The homeowner had video and audio surveillance equipment installed at

In the course of investigating the incident, I viewed surveillance footage and noted that at approximately 12:26 A.M., two individuals slowly approach and enter the driveway. Both individuals appear masked and wearing gloves; one individual is carrying a backpack. Ten minutes later, the vehicle carrying the homeowner arrives at the home. Shortly after the vehicle arrives, a struggle is heard, followed by a single gunshot. At 12:36 A.M., both individuals flee down the driveway. One individual appears to be carrying a handgun, and neither person was wearing a

backpack.

10.     While processing the crime scene, investigators discovered a back pack believed to have been left by the suspects; the contents of the back pack indicated a likely robbery. The backpack contained one roll of duct tape, eleven plastic zip ties, and three white plastic bags.

11.     The homeowner has told police that he is in the business of distributing marijuana.

12.     Following the robbery/shooting, the victim's girlfriend was interviewed by law enforcement and the girlfriend indicated that she had an opportunity to observe the robber's skin. Based on the observed skin tone, the girlfriend believed that the suspect was possibly Hispanic.

13.     Seven minutes after the 911 call reporting the robbery/shooting at

on August     2019, a York Police Department officer responding to the residence pulled over and staged on            in order to await the arrival of additional officers before proceeding to the residence.            leads to                and is not a heavily traveled roadway, particularly at that time of night.

14.     The York Police Department cruiser was equipped with a mobile license plate reader (LPR) which logs the registration plates of passing vehicles. At 12:46 A.M., the LPR affixed to the police cruiser logged a passing registration plate of New Hampshire     9827.

15.     Investigators determined that the registration plate was affixed to a Nissan Rogue, registered to Luis M. Carpio of Manchester, New Hampshire.

16.     During the early morning hours of August 3, 2019, investigators requested that officers with the Manchester Police Department make contact with the owner of the vehicle to ascertain the reason the vehicle was on            in York near the time of the incident. Officers responded to Carpio's residence and determined the vehicle was not present.

17.    I later obtained a criminal history maintained by the Manchester Police Department, which indicated they had arrested Carpio on several occasion; specifically on December 22, 2013 for two counts of armed robbery. The criminal history indicated that Carpio was convicted. This criminal history sheet indicated Carpio's phone number is        8371 (hereinafter "Carpio Phone").

18.    I queried a law enforcement data base for Andrew Soboleski and learned        4193 is a telephone number associated with Andrew Soboleski. Further, Manchester Police Department's records show Andrew Soboleski is the user of        -4193 (hereinafter the "Soboleski Phone").

19.    Through the subpoena process, I obtained subscriber information and toll records for the Carpio Phone.  These records show that Sprint is the provider of the Carpio Phone and that the listed subscriber is Yahindry Corona of                        in Manchester, NH. A law enforcement database indicated that Yahindry was Carpio's girlfriend at one time and he has a previous address at the same address. A review of call activity for the Carpio Phone reveals that the Carpio Phone was very active during the late night hours of August 2, 2019 and the early morning hours of August 3, 2019; however there was no activity between 12:19 A.M. and 1:12 A.M., the timeframe of the shooting/attempted robbery at

20.    On August      2019, I interviewed Luis Carpio at his residence in New Hampshire. I explained to Carpio that law enforcement detected his vehicle being in the vicinity of the incident being investigated, and the purpose of the interview was to determine if Carpio was a witness to the incident and may have pertinent information and to ascertain the reason for his presence in the area.  At the time of this interview, Carpio's Nissan Rogue, with New Hampshire registration      9827 was parked in front of Carpio's residence.

21.     Carpio was unable to provide any reason that his vehicle was in the vicinity on the early morning hours of August 3, 2019. Carpio stated he did not know anyone in York, Maine. Carpio appeared deep in thought, and in sum and in substance, stated that he had not been to the State of Maine in years. Carpio further denied being in the York, Maine area or any of the coastal Maine towns during the early morning hours of August 3, 2019.

22.     Carpio stated that he lent his vehicle to a friend, who he did not immediately identify, over the weekend of August 3rd however not during the timeframe of the robbery. Carpio denied that anyone else had the vehicle over the weekend, and that he had left the keys in the vehicle after making arrangements with his friend to pick up the vehicle at Carpio's place of employment in Manchester, New Hampshire on the afternoon of August 3rd. Carpio stated that no one has free access to take his vehicle without his knowledge and none of his friends would steal it.

23.     On August 21, 2019, officers with the Manchester Police Department responded to a disturbance involving Luis Carpio. During his encounter with Manchester officers, Carpio provided his current phone number as            8371 which is the number of the Carpio Phone.

24.     As part of this investigation, I obtained cell site data on the Carpio Phone. A preliminary analysis of the location data indicated that the Carpio Phone traveled to York/Kittery Maine and was interfacing with cellular towers servicing the            York area at approximately 12:09 AM on August 2, 2019 and remained in the area until approximately 3:30 AM- 4:00 AM. The device then left the State of Maine and began traveling in the area of towards Manchester, New Hampshire.

25.     On September 19, 2019, law enforcement personnel interviewed a witness (hereinafter "WITNESS") who stated the following:

26. WITNESS is Carpio's partner.

27. On the night of the robbery, Carpio lent a vehicle to an individual the witness knew as "Candy"

28. WITNESS does not know Candy's real name, but identified him as a dark skin male with tattoos on his back.

29. WITNESS was present when Candy arrived to borrow the vehicle. WITNESS estimated that Candy picked up the vehicle around 9:00 P.M. – 10:00 P.M.

30. WITNESS fell asleep after 11:00 P.M - 11:30 P.M.

31. At approximately 6:00 A.M. the following morning, WITNESS woke up and went to the store. The vehicle was present at the apartment, however Candy was not. WITNESS entered the vehicle and noticed that the vehicle was in disarray; specifically there was mud all over the interior of the vehicle, there was a large black duffel bag in the back, as well as masks and white plastic zip ties. Following the discovery, WITNESS brought the vehicle to a car wash and cleaned the interior because WITNESS didn't want to be involved in whatever happened. WITNESS placed all the suspicious items together in the bag and placed it in the trunk of the vehicle later discarded them in a dumpster.

32. WITNESS overheard the "whole story" of the robbery in a discussion between Candy and Carpio. WITNESS overheard Candy talking about a male who lives far away in a beautiful house being shot in the shoulder, a screaming female, a garage, and Candy and another male she knows as "Sobo" running through the woods. (Note: these specific details were similar to the actual events of the incident).

33.     WITNESS stated that Carpio told her that an individual named "Sobo" was also in the vehicle with Candy; WITNESS did not actually witness Sobo with Candy when the vehicle was picked up. WITNESS knows Sobo personally as Sobo resides in Manchester and frequents her work location. WITNESS stated she spoke with Sobo earlier in the day around 4:30 PM on phone at her work, and the caller ID provided his phone number and displayed a name similar to "Sobososki".

34.     Candelario's toll records indicate that in close proximity to the time both suspects were seen on surveillance video fleeing the victim's residence after the shooting, the Candelario phone called and sent text messages to the Soboleski phone. Phone calls were placed or attempted to be placed to the Soboleski phone at 12:49 A.M., 12:50 A.M., 12:51 A.M., 1:02 A.M., 1:08 A.M., and 1:28 A.M. Text messages were placed to the Soboleski phone at 12:50 A.M., 2:59 A.M., and 3:00 A.M. An open source Facebook search for "Andrew Soboleski" reveals a Facebook page with the display name "Andrew Sobo" who is "friends" with the Facebook account of Luis Carpio.

35.     In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower

closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

36.     Based on my training and experience, I know that T-Mobile can collect cell-site data about the phones at issue in this affidavit. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

37.     Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the subject phones' user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

38.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

39. In this case, because T-Mobile personnel will be assisting in the execution of the search warrant and the search will be no more intrusive at night than during the day, I request that the Court find that there is good cause to execute the warrant during either daytime or nighttime. *See* Fed. R. Crim. P. 41(e)(2)(a)(ii).

40. It is further requested that, pursuant to Title 18, United States Code, Section 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), the Court authorize notice to be delayed for a period of 30 days after the termination of the monitoring period authorized by the warrant or any extensions thereof, because there is reasonable cause to believe that providing immediate notification would seriously jeopardize the investigation. I further request that the warrant and this affidavit, as it reveals an ongoing investigation, be preliminarily sealed until the search warrant is returned (subject to future sealing extensions) in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others, except that working copies should be made available to the United States Attorney's Office, the FBI, and any other law enforcement agencies designated by the United States Attorney's Office.

Kyle Kassa
Task Force Officer, FBI

Sworn to before me this 21st day of October, 2019.

John H. Rich III
United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF RECORDS RELATED TO T-MOBILE CELLULAR TELEPHONE NUMBER (603) 820-5340 | No. 2:19-mj-341-JHR |

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Kyle A. Kassa, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I am a 2004 graduate of the Maine Criminal Justice Academy's 7th Basic Law Enforcement Program and am employed as a Deputy Sheriff with the York County Sheriff's Office (Maine), and have been since November of 2005. Prior to that I was employed as a Patrolman with the Buxton Police Department.  I am currently a Task Force Officer (TFO) assigned full time to the Federal Bureau of Investigation's Safe Streets Gang Task Force.

2.     In the course of my law enforcement training and experience, I have had an opportunity to search for, seize, and personally observe what I have recognized to be and what was later confirmed by drug analysis to be schedule drugs, including but not limited to heroin, fentanyl, methamphetamine, cocaine, marijuana (both dried and growing), crack cocaine, and various narcotics lawfully available only by prescription.  I have conducted or participated in, among other things, surveillance, undercover transactions, debriefings of informants and confidential sources, and reviews of taped conversations relating to narcotics trafficking.  I have assisted in many other investigations, both state and federal, to include investigations of crimes of violence. I have drafted numerous search and arrest warrants and have assisted in the execution of numerous search and arrest warrants.

1

Exhibit 2

3.      I have personally participated in the investigation set forth below.  I am familiar

with the facts and circumstances of the investigation through my personal participation, from

discussions with other agents of FBI and other law enforcement agencies, and from my review of

records and reports relating to the investigation.  Unless otherwise noted, wherever in this affidavit

I assert that a statement was made, the information was provided by another FBI agent, law

enforcement officer, or witness with knowledge of that statement and to whom I or others have

spoken or whose reports I have read and reviewed.  Such statements are among many statements

made by others and are stated in substance and in part unless otherwise indicated.

4.      I submit this affidavit in support of an application for a search warrant pursuant to

18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41, for the following:

a.  A search warrant directing T-Mobile to provide stored communication information,

including historical cell site and sector/face information[1]  and all true call data and/or

TDOA/Timing Advanced Information/Advanced Timing Data for telephone number (603)

820-5430 (hereinafter "Target Telephone 2"), a cellular telephone with service provided

by T-Mobile, 4 Sylvan Way Parsippany, NJ 07054.  I believe this telephone is used by

Andrew Soboleski.  I also request that the search warrant direct T-Mobile to provide a

listing of all control channels and their corresponding cell sites and an engineering map

showing all cell site tower locations, sectors, and orientations.

---

[1] A cell site is located in a geographic area within which wireless service is supported through radio signaling to and
from antenna tower(s) operated by a service provider. Cell sites are located throughout the United States. Cellular
telephones that are powered on will automatically register or re-register with a cellular tower as the phone travels
within the provider's service area.  The registration process is the technical means by which the network identifies
the subscriber, validates the account and determines where to route call traffic.  This exchange occurs on a dedicated
control channel that is clearly separate from that used for call content (i.e., audio) – which occurs on a separate
dedicated channel.  As used herein, "cell site information" refers categorically to any and all data associated with
registration of the target telephones with cell sites/network, as well as other data used by the network to establish a
connection with the telephone handset and to maintain connectivity to the network.  This includes the physical
location and/or address of the cellular tower, cell site sector, control channel number, neighbor cell lists, and any
identification numbers, processing data, and parameters not pertaining to the contents of a call.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that

violations of 18 U.S.C. § 1951 (Hobbs Act robbery) and 18 U.S.C. § 924(c) (possession of a

firearm during and in relation to a crime of violence) have been committed by unknown

individuals.

<u>Showing of Probable Cause</u>

6.      I adopt and incorporate my affidavit filed in the United States District Court for the

District of Maine (attached as Exhibit 1) dated October 22, 2019, in the matter of the search of

records related to the T-Mobile cellular telephone number          ·4193 (hereafter "TT-1").

7.      On October 30, 2019, T-Mobile provided me with call detail information associated

with "TT-1" from the dates of July 26, 2019 through August 8, 2019. A review of this data revealed

very limited phone activity between these dates.  Specifically, there was one (1) incoming text

message dated July 26, 2019, and five (5) incoming text messages on the morning of August 3,

2019 from          1370 (a number I believe to be used by        Candelario) a short time after

the shooting on                  Due to the very limited phone activity that was incoming only,

and with no cell site location data being available, I believe TT-1 was not in active use during the

timeframe of the requested dates, and it was likely that Soboleski was using a different phone

number.

8.      On October 22, 2019, I obtained a search warrant in the United States District Court

for the District of Maine for information associated with the Facebook account of

www.facebook.com          an account used by Luis Carpio. (2:19-mj-319-JHR).

9.      On November 6, 2019, Facebook provided me with data associated with Luis

Carpio's account. Among other information, I noted that Luis Carpio was 'Friends' with 'Andrew

Sobo', who I believe to be Andrew Soboleski. I noted a series of private messages exchanged between Carpio and Soboleski, including the following message:

| Date / Time | Sender | Receiver | Content |
|---|---|---|---|
| September 11, 2019 9:57 A.M. | Andrew Sobo | Luis Carpio | Aight please have him call me lmk if he need anything       5340 |

10.     Based on the content of the message, I believe that Soboleski was identifying his phone number as ·5340 (hereafter, "TT-2").

11.     I also noted a series of private messages exchanged between Luis Carpio and "Ish Garcia"[2] that occurred on the night of August 2, 2019 as follows:

| Date / Time | Sender | Receiver | Content |
|---|---|---|---|
| August 2, 2019 11:01 P.M. | Luis Carpio | Ish Garcia | Bro am on my way to da house with Candy and my boy if you there we whipping you down make my word |
| August 2, 2019 11:02 P.M. | Luis Carpio | Ish Garcia | Get the fuck out my house |
| August 2, 2019 11:03 P.M. | Ish Garcia | Luis Carpio | Lmao |
| August 2, 2019 11:03 P.M. | Ish Garcia | Luis Carpio | Stay wit that nigga pussy..Lol you need that man to guard you |
| August 2, 2019 11:06 P.M. | Ish Garcia | Luis Carpio | Lmao |

---

[2] A Manchester New Hampshire detective identified a Facebook photograph of "Ish Garcia" as Ismael Garcia of Manchester. The detective is personally familiar with Garcia because he had recently arrested Garcia along with Sugeiry Carpio, who is Luis Carpio's wife, in a fraud investigation.

| August 2, 2019 11:14 P.M. | Luis Carpio | Ish Garcia | Hahahahaha am see you before the night over my word I dare u to return to my house....You wanna think you hard we gonna see who really about this action |
|---|---|---|---|

12.     I believe that in this exchange, Carpio tells Garcia that he is with Jason Candelario ("Candy") and another person he references as "my boy", but who Carpio does not identify by name.

13.     On November 12, 2019, The Federal Bureau of Investigation issued a subpoena to T-Mobile, the cellular phone carrier for TT-2 for subscriber and toll records between the dates of July 14, 2019 and August 18, 2019. In response to the subpoena, T-Mobile identified the subscriber name as Andrew Soboleski with an address of                    in Manchester, New Hampshire.

14.     An analysis of toll records associated with TT-2 from the night of August 2, 2019 and the morning of August 3, 2019 indicated that TT-2 interacted with telephones known to be associated with Luis Carpio and Jason Candelario, among other persons as further described below.

15.     TT-2 interacted with Luis Carpio on the night of August 2, 2019 from 8:43 P.M. through 9:12 P.M.

16.     TT-2 interacted with Jason Candelario on the night of August 2, 2019, primarily by text messages from 8:52 P.M. through 9:37 P.M.

17.     On the morning of August 3, 2019, beginning minutes after suspects fled

TT-2 begins communicating primarily by phone calls to and from Jason Candelario.

The phone exchanges between TT-2 and Candelario occur twelve (12) times between 12:42 A.M. and 3:12 A.M.

18.     In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

19.     Based on my training and experience, I know that T-Mobile can collect cell-site data about the phones at issue in this affidavit. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

20.     Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as

name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the subject phones' user or users and may assist in the identification of co-conspirators and/or victims.

21.     Based on my training and experience, I know that T-Mobile also maintains records which contain timing advance information. Timing advance information equates to an estimate of a cellular device's distance from a cell tower when it's accessing network resources. The distance is estimated by a measurement of how much time it takes for a signal to travel to and from the device multiplied by the speed of light (the constant speed in which radiowaves travel). This information, sometimes referred to as engineering records, allows Radio Frequency engineers to monitor, optimize, and troubleshoot the T-Mobile network. Because it is maintained by T-Mobile in the normal course of business, it is available to law enforcement upon request.

## **AUTHORIZATION REQUEST**

22.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

23.    In this case, because T-Mobile personnel will be assisting in the execution of the search warrant and the search will be no more intrusive at night than during the day, I request that the Court find that there is good cause to execute the warrant during either daytime or nighttime. *See* Fed. R. Crim. P. 41(e)(2)(a)(ii).

24.    It is further requested that, pursuant to Title 18, United States Code, Section 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), the Court authorize notice to be delayed for a period of 30 days after the termination of the monitoring period authorized by the warrant or any extensions thereof, because there is reasonable cause to believe that providing immediate notification would seriously jeopardize the investigation. I further request that the warrant and this affidavit, as it reveals an ongoing investigation, be preliminarily sealed until the search warrant is returned (subject to future sealing extensions) in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others, except that working copies should be made available to the United States Attorney's Office, the FBI, and any other law enforcement agencies designated by the United States Attorney's Office.

Kyle Kassa
Task Force Officer, FBI

Sworn to before me this 27th day of November, 2019.

John H. Rich III
United States Magistrate Judge